**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| REGINA CLEMMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 06 C 3361 |
| OFFICE OF THE CHIEF JUDGE | ) | |
| OF CIRCUIT COURT OF COOK | ) | |
| COUNTY and STATE OF ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM ORDER AND OPINION

MARVIN E. ASPEN, District Judge:

Defendants, the Office of the Chief Judge of the Circuit Court of Cook County and the State of Illinois, move for summary judgment with respect to Plaintiff Regina Clemmer's remaining count of retaliation. Clemmer also moves for summary judgment regarding a single allegation of retaliation relating to her employer's failure to investigate her underlying (but previously dismissed) sex discrimination claim. Clemmer alleges that the Defendants, through the actions of a Cook County Circuit Court judge and Clemmer's supervisors, engaged in sex discrimination and retaliation against her in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*

## SUMMARY OF THE FACTS[1]

Clemmer has worked as an official court reporter for the Circuit Court of Cook County

---

[1] Unless otherwise noted, the facts described herein are undisputed. We primarily rely on the parties' Local Rule 56.1 statements of uncontested facts.

since 1996. (Pl.'s SOF, Ex. A, Clemmer Aff. ¶ 2.) Although the identity of her official employer has changed several times since she started working for the Circuit Court, she has at all times been paid by the state of Illinois, and she is currently employed by the Office of the Chief Judge of the Circuit Court of Cook County ("Office of Chief Judge"). (Pl.'s SOF ¶ 1; Def.'s Resp. to Pl.'s SOF ¶ 1; Def.'s SOF, Ex. A, Lawless Aff. ¶¶ 13-14.) Clemmer worked in the First Municipal District-South Division until her transfer to the Criminal Court Division in October 2007. (Pl.'s SOF, Ex. A, Clemmer Aff. ¶2.) Although Clemmer's official work hours are from 8:30 a.m. to 4:30 p.m., there is a dispute as to whether all court reporters were generally required to work until 4:30 p.m. (Pl.'s Resp. to Def.'s SOF ¶ 5.) Clemmer is paid a base salary, which does not change even if she is allowed to leave before 4:30 p.m., and is also paid by private attorneys and state and local government agencies for the transcripts that she produces. (Def.'s SOF, Ex. C, Clemmer's 2006 Dep. at 27-28, 118-19.) Clemmer has had various supervisors since 2001. At all times relevant to this motion, James Lawless was the Assistant Administrator in the Office of the Official Court Reporters ("Office") and Clemmer's second-level superior. (CSOF[2] ¶ 20.) From 2001-2003, her direct supervisor was Lynn Mangan. (*Id.* at ¶ 19.) After Mangan's retirement, Lois Damitz served as Clemmer's supervisor until January 2004, when Damitz retired. (*See id.* at ¶¶ 18, 24.) From that time until December 2005, Lawless filled in as the court reporter supervisor, and maintained his duties as the Assistant Administrator. (*Id.* at 20.) In January 2006, Nanette Comeaux-Brookins took over as the supervisor. (*Id.* at 21.)

---

[2] CSOF refers to Defendant's admissions and Plaintiff's responses in the Local Rule 56.1 filings made pursuant to Defendants' first motion for summary judgment, Defendants' Consolidated Local Rule 56.1 Statement of Uncontested Facts in Support of their Motion for Summary Judgment (Dkt. No. 44).

In January 2002, Clemmer complained to Mangan about alleged harassing conduct at the hands of Judge Iosco, a judge in the Circuit Court's domestic violence division under whom Clemmer sometimes worked. (Pl.'s SOF ¶¶ 8-12.) Clemmer subsequently filed a charged against Judge Iosco with the Judicial Inquiry Board ("JIB") in June 2002. (Pl.'s SOF ¶ 15; Def.'s SOF, Ex. C, Clemmer's 2006 Dep. at 12-15.) In August 2002, she also filed a formal complaint with the EEOC. (Pl.'s SOF ¶ 18; CSOF ¶ 112.) In November 2002, the JIB found that Clemmer's charges were unfounded and informed her that it would not file a formal complaint against Judge Iosco on her behalf. (Def.'s SOF, Ex. C, Clemmer's 2006 Dep. at 91.) Clemmer filed this lawsuit in June 2006, alleging sexual harassment and retaliation in violation of Title VII. In March 2007, we granted in part and denied in part Defendant's motion for summary judgment; we granted summary judgment for Defendants on Clemmer's sexual harassment claim and on most of her allegations regarding her retaliation claim. *Clemmer v. Office of the Chief Judge of Circuit Court of Cook County*, No. 06 C 3361, 2007 WL 1390618, at *5-7 (N.D. Ill. May 9, 2007). Specifically, we granted summary judgment for the following allegations: "Clemmer's assignment to the Maywood courthouse; Lawless' admonition that she could only work at 26th and California if she agreed to work there permanently; Brookins' occasion that she overcharged for transcripts – which did not result in discipline; and her dispute with Brookins and Lawless regarding her supervisors' refusal to let her leave work early."[3] *Id.*

───────────────────

[3] Although she attempts to do so, Clemmer may not reallege retaliation actions that were rejected in the first summary judgment opinion. For example, Clemmer continues to allege that Comeaux-Brookins retaliated against her by refusing to allow her to leave before 4:30 pm, despite the fact that other court reporters were allowed to leave. (*See* Pl.'s Resp. to Def.'s SOF ¶ 5; Pl.'s SOF, Ex. A, Clemmer's Aff.¶¶ 39-42.) Similarly, Clemmer apparently realleges that Comeaux-Brookins retaliated against her by falsely accusing her of overcharging on transcripts. However, we clearly previously decided that such acts did not constitute retaliation. *Clemmer*,

Although Clemmer alleges that all of her supervisors, including Mangan, Damitz, Comeaux-Brookins and Lawless, knew of her sexual harassment complaint (Pl.'s SOF ¶ 8, 9, Ex. A, Clemmer's Aff. ¶ 42; Pl.'s Resp. to Def's SOF ¶ 79), there is a dispute regarding the scope of Comeaux-Brookins' knowledge (Def.'s SOF ¶79). Clemmer acknowledges that she "does not have specific evidence" that Comeaux-Brookins was aware of the JIB complaint or the EEOC filing (Pl.'s Resp. to Def.'s SOF ¶ 79), but states in her sworn affidavit that she had conversations with Comeaux-Brookins regarding her sexual harassment complaint and that she specifically "told [Comeaux-Brookins] of [her] intention to retain counsel and take legal action" (Pl.'s SOF, Ex. A, Clemmer's Aff. ¶42).

Clemmer alleges various acts of retaliation beginning in 2002 after she filed complaints with The JIB and the EEOC, and escalating after the EEOC mailed a copy of her right-to-sue letter to her employer in 2006. She does not allege that either Mangan or Damitz, her supervisors between 2002 and 2004, retaliated against her. (Pl.'s Resp. to Def.'s SOF ¶¶ 30, 78.) She alleges, however, that Lawless committed several retaliatory acts as her second-level supervisor and acting supervisor. Clemmer alleges that Lawless retaliated against her in the following ways: increasing her to be assigned ("TBA") assignments;[4] failing to schedule her for her preferred schedule; increasing her Monday and Friday preliminary hearing room

---

2007 WL 1390618, at *6.

[4] When a court reporter is given a TBA assignment, she is not assigned to any specific courtroom, but is instead used for previously unforeseen shortages. (Def.'s SOF ¶ 13.) These assignments are given primarily when there are more court reporters working on a given day than there are courtrooms. *Id.* A reporter scheduled as TBA is given a courtroom assignment if another reporter calls in sick, or if he or she is needed to cover another division. (*Id.* ¶¶ 17-18.) If no coverage is needed, the person assigned TBA will remain TBA for that day. (Def.'s SOF, Ex. A ¶ 78.)

assignments, but decreasing her Tuesday, Wednesday, and Thursday assignments; giving her 24 hours to decide whether she wanted to permanently transfer to the Criminal Division; and presenting her with an ultimatum regarding that transfer. (Pl.'s Resp. to Def.'s SOF ¶¶ 48-49.) Clemmer also asserts that Comeaux-Brookins retaliated against her by: assigning her to undesirable courtrooms; denying her requested vacation time twice, once to attend Court; forcing her to charge a lower rate for a transcript; treating her in a rude manner; and denying her transfer request. (*Id.*) She additionally alleges that Comeaux-Brookins' conduct constituted retaliation when she: interfered with her transcript orders and charges; required her to stay after her court adjourned, while other court reporters were allowed to leave; failed to inquire about her preferred schedule; and manipulated with her schedule. (Pl.'s SOF, Ex. A, Clemmer's Aff. ¶ 11.) The rest of this section explores the most relevant of these allegations in more detail.

## I. Allegations Regarding Scheduling

Because many of Clemmer's allegations revolve around her schedule, we describe the various types of schedules. Clemmer was a "high producer," meaning that she could produce a high volume of transcripts. (Def.'s SOF ¶ 33; Pl.'s SOF, Ex. A, Clemmer's Aff. ¶ 15.) Because the preliminary hearing rooms were particularly busy on Tuesdays, Wednesdays, and Thursdays, assignments to preliminary hearing rooms on those days gave reporters the opportunity to earn more income from transcript orders, and "high producers" preferred to work such courtrooms on those days. (Def.'s SOF ¶ 32; Pl.'s SOF, Ex. A, Clemmer's Aff. ¶ 15.) Until 2005, there were only three preliminary hearing courtrooms; an additional preliminary hearing courtroom was added in October 2005. (Def.'s SOF ¶ 8.) The South Municipal Division underwent many other changes between 2003 and 2005. For example, in July 2003, the Division stopped staffing the

two traffic courtrooms; in January 2005, its staffing responsibility over Housing Courtroom 1101 ended; and, five probate courtrooms were removed from the Division in 2005. (*Id.* ¶ 3.) Additionally, in October 2005, one Domestic Violence Courtroom was closed. (*Id.* ¶ 5.) In October 2005, two courtrooms that handled orders of protection were added to the Division. (*Id.* ¶ 6.) In addition to these courtrooms, court reporters in the South Municipal Division could be assigned outside the division, depending on needs of other divisions. (Def.'s SOF, Ex. A, Lawless' Aff. ¶ 29.)

High producers, like Clemmer, preferred certain courtrooms over others. In addition to the Tuesday-Thursday preference for preliminary hearing courtrooms, Clemmer preferred placement in other courtrooms that were also likely to result in high transcript orders. (Pl.'s SOF, Ex. A, Clemmer's Aff. ¶ 13.) Clemmer claims, however, that Lawless and Comeaux-Brookins did not equitably rotate court reporters throughout these preferred courtrooms, but instead used the assignments to "punish" certain "disfavored" reporters. (Pl.'s SOF ¶¶ 25-26.) To support this claim, she presents her own affidavit and affidavits from Rosita Carter, Larissa Frank, and Diane Washington, other court reporters in her division. (*See* Pl.'s SOF, exs. B-D.) Clemmer also alleges that Lawless retaliated against her by giving her more TBA assignments and other assignments that "requir[ed] her to sit in an office and do no work." (Pl.'s Consol. Br. in Opp. to Def.'s MSJ and Mot. for Partial SJ at 5 [hereinafter Pl.'s Consol. Br.]; Pl.'s SOF, Ex. A, Clemmer's Aff. ¶¶ 23, 26, 29.) Clemmer further argues that although Comeaux-Brookins did not assign her any TBA assignments, she assigned her to courtrooms in which there was no work, which, according to her, were the equivalent of TBA assignments. (Pl.'s SOF, Ex. A, Clemmer's Aff. ¶¶ 25, 29.)

To support her claim that she was assigned more TBA and fewer preliminary hearing assignments than other reporters, Clemmer cites the daily and weekly assignment schedules. (*See* Pl.'s SOF, exs. A-4 – A-6.) Clemmer presents summaries of the actual assignments and assignments worked after any switching. (*See id.* A-7.) Defendants have also provided summaries. (*See* Def.'s SOF ¶¶ 38-42, exs. A-2, A-4, A-7.) Clemmer, however, argues that Defendants' summaries are made up of the assignments actually worked, after voluntarily trading with other court reporters, and not the actual assignments scheduled by Lawless and Comeaux-Brookins. (Pl.'s Resp. to Def.'s SOF ¶¶ 38-42.) Because we must interpret the facts in favor of the nonmovant, who on this issue is Clemmer, we will look to Clemmer's exhibits regarding her assignments, to the extent possible.

## II. Allegations Regarding Transfer to Criminal Division

Around August 2005, and in response to Clemmer's request for more high transcript-producing courtrooms, Lawless offered to send Clemmer to the Criminal Division where she would get the opportunity to make more income through transcript requests. (Def.'s SOF ¶ 72.) With her agreement, Lawless scheduled her to that Division 29 times. (Def.'s SOF ¶ 43.) Clemmer alleges that, in an attempt to get her to leave his Division, Lawless gave Clemmer 24 hours to decide whether she wanted to be transferred to the Criminal Division permanently. (Pl.'s SOF, Ex. A, Clemmer's Aff. ¶ 74.) Lawless admits that he gave Clemmer the option to transfer, but denies that he demanded an answer within 24 hours. (Def.'s SOF ¶ 43.) Clemmer alleges that this was retaliatory because no other employee was given such an ultimatum.

Clemmer also claims that Lawless retaliated against her in 2007 when she applied for a transfer to the Criminal Division. Although Clemmer denied the option to transfer to the

Criminal Division in 2005, in June 2007, she requested a transfer to that Division. (*Id.* ¶ 66.) Although there is a dispute as to how many positions were open at the time (*see* Pl.'s Resp. to Def.'s SOF ¶ 66), another court reporter, Grace Brennan was given the transfer. (Def.'s SOF ¶ 67.) Defendants state that this decision was based on seniority. (*Id.*; *but see* Pl.'s Resp. to Def.'s SOF ¶ 67.) However, Brennan later withdrew her transfer request, placing Clemmer next in line for the transfer. (Def.'s SOF ¶ 67.) Clemmer had to wait until the position was reposted, which occurred in November 2007; thereafter she was transferred to the Criminal Division. (*Id.* ¶ 68.) Clemmer alleges that there was more than one position open in the Criminal Division, and that her employer's refusal to transfer her after her initial request was retaliation, not a decision based on seniority. (Pl.'s Consol. Br. at 6; Pl.'s SOF, Ex. A, Clemmer's Aff. ¶¶ 77-81.)

## III. Allegations Regarding the Denial of Vacation Requests and Sick and Personal Days

Clemmer claims that Comeaux-Brookins retaliated against her on several instances when she was denied vacation requests and sick and personal days. In October 2006, Clemmer requested four weeks of vacation for the 2007 year. (*See* Def.'s SOF ¶¶ 50-51, Ex. 2.) She was ultimately granted two of these weeks, a week in May and a week at the end of August. (*Id.* ¶ 50.) Clemmer still wanted a third week of vacation, for a family vacation, sometime between June and August. (*Id.* ¶ 54.) Because other court reporters with more seniority had already requested time off during that period, Comeaux-Brookins experienced difficulty scheduling this vacation. (*Id.* ¶¶ 51-54.) Clemmer asked Comeaux-Brookins to show her a list of available weeks. (Pl.'s SOF, Ex. A, Clemmer's Aff. ¶¶ 45-46.) Comeaux-Brookins refused, explaining that she did not have such a list. Clemmer claims, however, that she saw Comeaux-Brookins use this list at a prior time. (*Id.*) Clemmer was eventually given the week of August 6, 2007 off,

after Comeaux-Brookins requested another that court reporter cancel a second consecutive week of vacation.[5]  (Def.'s SOF ¶ 56.)  Before Comeaux-Brookins notified Clemmer that she would be given the week of August 6, 2007, Clemmer also called Marilyn Filishio, Lawless's supervisor, in an attempt to schedule her vacation.  (Pl.'s SOF, Ex. A, Clemmer's Aff. ¶¶ 47-48.)  Although Clemmer claims that her call to Filishio resulted in approval of her vacation request (*id.* ¶¶ 47-49), Defendants state that the week became available only after Comeaux-Brookins cancelled the other reporter's vacation.  (Def.'s SOF ¶ 56.)  Clemmer also testified that Comeaux-Brookins called her six times in a single day after she spoke with Filishio, demanding that in order to grant her vacation request, Clemmer had to fax another copy of the request, which Clemmer did the next day.  (Pl.'s SOF, Ex. A, Clemmer's Aff. ¶ 49.)

In July 2007, when Clemmer was temporarily assigned to the Criminal Division, Clemmer wanted to use a vacation day to attend Court in this matter.  (Def.'s SOF ¶¶ 57-60.)  Clemmer sent a faxed request to Comeaux-Brookins, but she never received this request.  (*Id.* ¶ 58.)  Defendants state that by the time Comeaux-Brookins received Clemmer's second request, the schedules were already posted.  She therefore denied that request.  (*Id.* ¶59.)  Clemmer contends that the schedule was not posted because they typically were not posted until Friday afternoon, and she sent her request on Friday at 11:30 a.m.  (Pl.'s Resp. to Def.'s SOF ¶ 59; Pl.'s SOF, Ex. A, Clemmer's Aff. ¶50.)  Even assuming that Clemmer is correct that the schedules were not posted at the Criminal Division, there is no dispute that vacation requests must be

---

[5] Although Clemmer denies that Comeaux-Brookins cancelled another reporter's vacation, the source in the record that she provides to support her denial demonstrates that she does not have the requisite knowledge of the situation to deny Defendant's statement.  (*See* Pl.'s SOF, Ex. A, Clemmer's Aff. ¶ 7 (stating that Comeaux-Brookins "did not state that anyone had to, or was going to, cancel his or her vacation plans to accommodate my request").)

submitted before the schedule is posted in the South Municipal Division, not the Criminal

Division.  (*See* Def.'s SOF ¶ 59.)  Clemmer ultimately was able to take the day off to attend

Court by using a sick day.[6]  (*Id.*)

Clemmer also alleges that Comeaux-Brookins retaliated against her by denying her use of

personal days.  Clemmer requested personal days on the days prior to and subsequent to the

Thanksgiving and Christmas holidays in 2007.  (*Id.* ¶ 65.)  Clemmer received those days off in

2006, but she called in sick on the day before her scheduled personal day before Thanksgiving,

and on the day after her scheduled personal day after Christmas.[7]  (*Id.* ¶ 64.)  Comeaux-Brookins

states that because the Office was understaffed in 2006 around the holidays, she denied such

personal day requests to people who called in sick before a scheduled personal day near a

holiday.  (Def.'s SOF ¶¶ 62, 63, 65, Ex. B ¶¶ 97-99.)  Therefore, Comeaux-Brookins claims that

this policy decision drove her denial of Clemmer's personal day requests.  (*Id.*)

As discussed above, Clemmer asserts other allegations of retaliation.  To the extent that

more facts are needed regarding those assertions, the facts will be more fully discussed below.

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56(c).  A

---

[6] Although Clemmer denies this paragraph in its entirety, the citation to the record that
she provides does not demonstrate that she was denied use of her sick day.  Local Rule 56.1
requires plaintiffs to submit supporting citations to each denial; if the citation does not support
the denial, it is treated as an admission.  Therefore, we treat this denial as an admission, but only
to the fact that she did actually take a sick day to attend Court in July 2007.

[7] Clemmer also denies this statement.  However, the citation she provides actually
support Defendant's assertion that she called in sick on those days.  (Pl.'s Resp. to Def.'s SOF ¶
64; Pl.'s SOF, Ex. ¶¶ 57-59 (admitting that she called in sick on those days.)

genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255. However, "our favor toward the nonmoving party does not extend to drawing 'inferences that are supported by only speculation or conjecture.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008)). Therefore, the plaintiff cannot merely "raise some metaphysical doubt as to the material facts; [she] must come forward with specific facts showing that there is a genuine issue for trial." *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). Moreover, "in considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the non-moving party must identify with reasonable particularity the evidence upon which the party relies." *Hemsworth II v. Quotesmith.com*, 476 F.3d 487, 490 (7th Cir. 2007).

## ANALYSIS

**I. Defendants' Motion for Summary Judgment**

Under Title VII, it is unlawful for an employer to retaliate against an employee who has opposed any discriminatory practice in the workplace or who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" addressing such concerns. 42 U.S.C. § 2000e-3(a). A plaintiff can establish a *prima facie* case of retaliation under either the direct or indirect methods. Because Clemmer asserts that she can satisfy the requirements of either method, both will be discussed in turn.

**A. Direct Method**

To prove retaliation under the direct method, Clemmer must "(1) offer evidence that she engaged in a statutorily protected activity; (2) that the defendants subjected her to an adverse employment action; and (3) that a causal connection exists between the two events." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008) (citing *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Accordingly, Clemmer can establish a claim of retaliation by presenting either direct or circumstantial evidence that proves "that [she] engaged in protected activity . . . and as a result suffered the adverse employment action of which [she] complains." *Stone*, 281 F.3d at 644; *Sylvester v. SOS Children's Vills. of Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) (clarifying that *Stone* does not stand for the premise that the direct method can only be satisfied through direct evidence). "[D]irect evidence 'essentially requires an admission by the decision maker that his actions were based on the prohibited animus' and so is rarely present." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005) (quoting *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003)). Clemmer does not offer any direct evidence of retaliation. (*See*

Pl.'s Resp. to Def.'s SOF ¶77; Pl.'s SOF, Ex. A, Clemmer's Aff. ¶¶ 85-86.)  Therefore, she must

rely on circumstantial evidence to establish her retaliation claim under the direct method.

The Defendants acknowledge that Clemmer engaged in statutorily protected conduct.

(Mem. at 6.)  However, they argue that Clemmer was not subject to adverse action and that, if

she was, there was no causal connection between her protected activity and the adverse action.

## 1. Materially Adverse Action

To state a claim for retaliation, Clemmer must prove that the adverse action imposed

upon her was material.  Although the Seventh Circuit has instructed that "the range of employer

conduct that constitutes an adverse employment is broad," it is "not unlimited."  *Johnson v.*

*Cambridge Indus.*, 325 F.3d 892, 902 (7th Cir. 2003).  In *Burlington Northern & Santa Fe*

*Railway Co. v. White*, the Supreme Court clarified that to prove an actionable adverse action in

claims of retaliation, "a plaintiff must show that a reasonable employee would have found the

challenged action materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53, 68, 126

S. Ct. 2405, 2415 (2006) (internal quotations omitted).  As the Supreme Court explained,

however, "Title VII . . . does not set forth 'a general civility code for the American workplace.'"

*Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.* 523 U.S. 75, 80, 118 S. Ct. 998, 1000

(1998)).  Additionally, "[a]n employee's decision to report discriminatory behavior cannot

immunize that employee from those petty slights or minor annoyances that often take place at

work and that all employees experience."  *Burling Northern*, 528 U.S. at 68, 126 S. Ct. at 2415.

Although we evaluate the allegations from an objective point of view, "context matters."  *Id.* at

70, 126 S. Ct. at 2415.

Although Clemmer alleges a plethora of acts of retaliation, we conclude that none of those alleged acts, viewed separately or cumulatively, were significant enough to deter reasonable employees in Clemmer's position from filing discrimination charges or complaints.

**a. Preliminary Hearing and TBA Assignments**

First, the alleged acts of retaliation regarding Clemmer's schedule were not significant enough to deter a reasonable employee from filing a discrimination charge. Clemmer alleges that both Comeaux-Brookins and Lawless retaliated against her by increasing her TBA assignments and not giving her the schedule she preferred, consisting of as many preliminary hearing courtrooms on Tuesday, Wednesday, and Thursday as possible. (Pl.'s SOF ¶¶ 25-26.) Although there is a discrepancy over the correct calculations of the number of TBA and preliminary courtroom assignments the court reporters received during the relevant time period (*see* Pl.'s Resp. to Def.'s SOF ¶¶ 38-42), even assuming Clemmer's proposed calculations are correct, we conclude that any difference arising after her 2002 EEOC charge insignificant. For example, in 2005, the first year in which Lawless was Clemmer's supervisor, Clemmer was assigned to 102 preliminary hearing courtrooms. (Pl.'s SOF, Ex. A-7.) Comparatively, the other high producers, Epps, Brennan, and Mitchell,[8] were assigned 94, 109, and 66 preliminary hearing courtrooms, respectively. (*Id.*) In 2006, Clemmer was assigned 116 preliminary hearing courtrooms; Epps, Brennan, and Mitchell were assigned 73, 91, and 134 of such rooms, respectively. (*Id.*) Based on these numbers, Clemmer was not actually assigned fewer preliminary courtrooms than the other high producers. In fact, she was often assigned more. To

---

[8] The parties agree that these court reporters were high producers. (*See* Pl.'s Resp. to Def.'s SOF ¶ 33.)

the extent that there was any difference in these assignments, that difference was trivial, and was such that it would not dissuade a reasonable person from bringing a discrimination charge.

As Clemmer points out, however, the tabulations that she provided to us do demonstrate that she received fewer preliminary hearing assignments between May and July 2006, shortly after her employer received a copy of the EEOC's right-to-sue letter.[9] (*Id.* (demonstrating that Clemmer received eight such assignments in May, five in June, and seven in July).) However, Clemmer received a comparable number of preliminary hearing assignments during those months as at least three "favored employees."[10] For example, Brennan, another high-producer, received eight, seven, and four; Chancellor received nine, seven, and one; and Smith received nine, four, and eleven. (*Id.*) Moreover, Clemmer's decreased assignments only lasted for three months, after which they returned to normal. Although Clemmer hypothesizes that this decrease affected her gross income by approximately $100 - $400 for each day she was not assigned to a preliminary hearing room (Pl.'s SOF, Ex. A, Clemmer's Aff.¶32), she offers no evidence other than her own statement to demonstrate that her salary was actually affected. In fact, Clemmer admitted that her income in 2005 increased from the prior year. (Def.'s SOF, Ex. C, Clemmer's 2006 Dep. at 122:5.) Therefore, even though the number of Clemmer's assignments to preliminary hearing courtrooms decreased for three months, we do not think that scheduling

---

[9] Although we hold that any decrease in preliminary hearing assignments for this short time period was not adverse action, we also hold that the issuance of the EEOC's right-to-sue letter is not a separate protected activity that Clemmer can use to support her claim of retaliation. (*See infra* at 20.)

[10] Although Defendants deny that there were favored employees, Clemmer alleges that there were two groups of employees: favored and disfavored. (*See* Def.'s Resp. to Pl.'s SOF ¶ 25.)

change was so adverse that it would prevent a reasonable person from bringing a complaint of harassment.

Similarly, in comparing the alleged increase in the number of TBA assignments, Clemmer has not proven that any increase actually happened or was so significant that it would dissuade a reasonable employee from complaining of discrimination. In 2005, Clemmer was assigned 12 TBA assignments; Epps was assigned 15; Brennan was assigned 9; and Mitchell was assigned 11.[11] (*Id.*) Indeed, Clemmer had four fewer TBA assignments in 2005 than in 2002, a year in which Clemmer acknowledges that she was not being retaliated against. (*Id.*) Therefore, the alleged acts of retaliation relating to her scheduling, including her preferred schedule and the number of TBA assignments, were not materially adverse actions and are not actionable.

**b. Transfer to Criminal Division**

We find that Lawless's actions regarding Clemmer's transfer to the Criminal Division were not materially adverse. Even assuming, contrary to Lawless's affidavit, that Lawless gave Clemmer 24 hours to decide whether to take a transfer to the Criminal Division, we do not think that such an offer is a materially adverse action. Clemmer does not allege any circumstances that would indicate that she could not make that decision within 24 hours. (*See* Pl.'s SOF, Ex. A, Clemmer Aff.¶ 74-75.) The fact that Lawless did not place this restriction on others is not enough to show that it was an adverse action. Although 24 hours may be a short period of time

---

[11] Although Clemmer argues that certain other courtrooms were the equivalent of TBA assignments in that there was little work for court reporters in those courtrooms (*see* Pl.'s SOF, Ex. A, Clemmer's Aff.¶ 29), she does not indicate to us how many days she worked in such "TBA-equivalent courtrooms." Clemmer does provide us with three large binders containing the daily assignment sheets from 2005-2007. However, she does not direct us to which days she worked in "TBA-equivalent" courtrooms or include those courtrooms in her own tabulations. Therefore, we do not consider these other assignments.

-16-

in which to decide whether one wants a transfer, it is not unreasonable. Moreover, it is not the type of action that would make a reasonable employee decide not to complain of sexual harassment. *Burlington Northern*, 548 U.S. at 68, 126 S. Ct. at 2415. Had Lawless told her that she had to decide within 24-hours whether she wanted a transfer to the Criminal Division or lose her job, for example, this sort of ultimatum may have been adverse.

Clemmer also argues that the denial of her request to transfer to the Criminal Division was a retaliatory act. We agree that the denial of transfer request could dissuade a reasonable employee from bringing a claim of sexual harassment against her employer. *See Davis v. Springfield*, No. 03 C 3007, 2008 WL 361025, at *2 (C.D. Ill. Feb. 8, 2008) (explaining that the Seventh Circuit opinions supporting the proposition that a denial of a transfer is not an adverse employment action predated *Burlington Northern*, a case in which the Supreme Court "broadened the standard of conduct that could constitute actionable retaliation") (citing *Burlington Northern*, 126 S. Ct. at 2415). However, given the circumstances of this case, we question whether the denial was severe enough to dissuade such an employee from making a harassment claim. The evidence shows that Clemmer was denied her request a more senior court reporter, Grace Brennan, requested the same transfer. Although Clemmer alleges that there were multiple openings in the Criminal Division (Pl.'s Resp. to Def.'s SOF ¶¶ 66-67), she does not offer any admissible evidence that there was more than one opening.[12] Brennan eventually

[12] Clemmer submitted a copy of an article from the *Daily Law Bulletin*, which discussed a shortage of court reporters in the Criminal Division. (Pl.'s SOF, Ex. A-8.) This article, however, is inadmissible hearsay under Federal Rule of Evidence 801. She also submitted evidence that ten additional court reporters were hired after her transfer was eventually approved, which she argues indicates that there was more than one opening in the Criminal Division. (Pl.'s SOF, Ex. A, Clemmer Aff. ¶ 81.) The fact that more reporters were later hired, however, does not demonstrate that there was more than one opening that the Office was in a

decided not to take the transfer, which put Clemmer next in line. When the Office reposted the opening, Clemmer applied for and was granted the transfer. (Def.'s SOF ¶¶ 67, 69.) These additional facts lead us to doubt that the initial denial of Clemmer's request was an adverse action. However, even if this denial constituted an adverse employment action for reasons we discuss below, it would not establish actionable retaliation.

### c. Denial of Vacation, Sick, and Personal Days

Clemmer alleges that Comeaux-Brookins retaliated against her when she placed her on standby for requested vacation in 2007 and refused to give her a record of the available vacation weeks, denied her vacation request for a single day during the summer of 2007, denied her personal day requests around the holidays in 2006, and denied her sick day request for a single day in July 2007. (*See* Pl.'s SOF, Ex. A, Clemmer Aff.¶¶ 43-68.) We agree that the denial of vacation, sick, and/or personal days may rise to the level of a materially adverse employment action. However, we doubt that the denials in this case rose to that level because her supervisor followed stated Office policy in making those decisions (*see* Pl.'s Resp. to Def.'s SOF ¶¶ 51-53 (admitting that she was placed on standby for her requested weeks because reporters with more seniority requested those weeks off)), the actions were of such a singular nature that they would not likely dissuade a reasonable employee from bringing a discrimination charge, and most of the requests were eventually granted after reworking schedules (Def.'s SOF ¶ 56; Pl.'s SOF, Ex. A, Clemmer Aff.¶ 47.). Nonetheless, even if these actions were materially adverse employment actions, they are not actionable because, as discussed later, Clemmer has not satisfied the other elements of her retaliation claim.

---

position to fill at the time that she initially applied for her transfer request.

### d. Other Alleged Acts of Retaliation

Clemmer alleges other actions to sustain her complaint of retaliation.  For example, she claims that Comeaux-Brookins interfered with her transcript rates (Pl.'s Resp. to Def.'s SOF ¶¶ 74-76), was selectively rude to her (Pl.'s SOF, Ex. A, Clemmer Aff.¶ 84), suspiciously required all court reporters to sign a document when they received a new copy of the Office's confidentiality policies (*id.* ¶ 87), removed contents from her personnel file (*id.* ¶ 89), and tampered with transcript payment vouchers (*id.* ¶¶ 92-95).  For various reasons, Defendant's behavior does not constitute actionable adverse employment action.

First, regarding Comeaux-Brookins' alleged interference with Clemmer's transcript rates, we agree with Defendants that Clemmer's allegations are partly based on inadmissible hearsay. Clemmer states that after an attorney placed an order for a transcript in the courtroom, another court reporter, Larissa Frank, told Clemmer that she overheard Comeaux-Brookins tell the attorney that she could get the transcript for him at a lower rate.  (Def.'s SOF, Ex. E, Clemmer's 2008 Dep. Part I, at 103:13-18.)  Clemmer also testified that she had a conversation with Comeaux-Brookins in which Comeaux-Brookins told Clemmer that she had to charge a lower rate to the attorney because the State ordered the transcript first.  (*Id.* at 103:19-2 & 104.) However, Clemmer claims that the private attorney made the first order, in person at the courtroom.  (*Id.*)  We hold that this single instance would not "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 548 U.S. at 68, 126 S. Ct. at 2415.  This seems to be a "trivial harm."  Had Clemmer demonstrated that

Comeaux-Brookins did this routinely, we may hold differently.[13] As it is, this single incident is not materially adverse.

Similarly, the remaining allegations of retaliation amount to "petty slights or minor annoyances that take place at work and that all employees experience," which are not actionable under Title VII retaliation claims. *Id.* (recognizing that snubbing by supervisors and a "simple lack of good manners will not create such deterrence"); *see also Henry v. Milwaukee County*, 539 F.3d 573, 586-87 (7th Cir. 2008).

Although some of the acts Clemmer has alleged may have been materially adverse, most were not. We hold that the denial of Clemmer's transfer and vacations requests could lead a jury to find that a reasonable employee would have been dissuaded from bringing a discrimination charge. However, even if those actions did rise to the level of materially adverse, they are not actionable for reasons discussed below.

**2. Causation**

Even assuming that the actions taken against Clemmer were materially adverse, Clemmer fails to present even circumstantial evidence of a causal link between her protected activity and the alleged retaliatory action. Clemmer must prove not only that she engaged in a protected activity, but also that *as a result* of that protected activity, she suffered adverse employment action. *Sylvester*, 453 F.3d at 902. Without direct evidence of such a causal link, which as we previously explained Clemmer lacks, Clemmer must provide circumstantial evidence of such a connection.

---

[13] Although Clemmer argues that this did happen on more than one occasion (*see* Pl.'s Resp. to Def.'s SOF ¶ 49), she has not provided evidence or facts to support that broad statement.

Clemmer argues that the facts of this case support a claim under the direct method, but she never cites which facts in the record establish the causal link necessary under this method. Instead, Clemmer uses general language to argue that there is a causal connection. (*See* Pl.'s Consol. Br. at 6.) For example, Clemmer simply states that "[t]he facts herein present sufficient circumstantial evidence such that a jury could infer retaliation," without specifying which facts establish that inference. (*Id.*) Clemmer "must identify with reasonable particularity the evidence upon which [she] relies." *Hemsworth, II*, 476 F.3d at 490. She has not done so, and it is not our job to "scour the record in search of evidence to defeat the motion [for summary judgment." *Id.*

Clemmer suggests that we should infer causation from the temporal proximity of her employer's receipt of her right-to-sue letter and her decreased preliminary hearing assignments. (Pl.'s SOF, Ex. A, Clemmer Aff. ¶ 9.) Courts can infer causation from temporal proximity only when the "employer's adverse action follows fairly soon after the employee's protected [activity]." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998). Protected activity, however, does not include the EEOC's issuance or receipt of a right-to-sue letter. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 126 S. Ct. 1508, 1511 (2001) (noting that the suggestion "that the EEOC's issuance of a right-to-sue letter – an action in which the employee takes no part – is a protected activity of the employee" is "utterly implausible") (per curiam); *Derosena v. Gen. Bd. of Pensions & Health Benefits of the United Methodist Church*, 560 F. Supp. 2d 652, 670 (N.D. Ill. 2008) (citing *Clark County Sch.* and holding that the EEOC's issuance or plaintiff's receipt of her right-to-sue letter cannot constitute protected activity). Therefore, we cannot draw an inference of causation based on the temporal proximity between the date of the letter and the decrease in Clemmer's preliminary courtroom assignments between

May and July 2006.  Rather, there must be some proximity between Clemmer's earlier protected activity (her initial complaints to Lynn Mangan, The JIB, and the EEOC made in 2002) and her employer's adverse activity.  Clemmer has not provided evidence of such proximity; in fact, we have already granted summary judgment on her allegations that occurred prior to 2005.  *See Clemmer*, 2007 WL 1390618, at *6 (granting summary judgment for the allegation regarding Clemmer's assignment to the Maywood courthouse).  The only remaining instances of adverse action occurred after 2005, when Lawless took over as Clemmer's immediate supervisor.  This span of three years does not support an inference of causation based on temporal proximity.  *See, e.g.*, *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 616 (7th Cir. 2001) (holding that an eight-month delay "was too attenuated to support a jury verdict of retaliation"); *Pluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000) (holding that a one-year delay, standing alone, was too attenuated); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918-19 (7th Cir. 2000) (concluding that three months was too attenuated).  Because Clemmer does not provide any other evidence from which a jury could infer causation, her claim cannot succeed under the direct method.

## B.  Indirect Method

A plaintiff can successfully establish a claim for retaliation under the indirect method by demonstrating that "after opposing the employer's discriminatory practice only he, and not any similarly situated employee who did not complain of discrimination, was subjected to a materially adverse action even though he was performing his job in a satisfactory manner." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007); *see also Sylvester*, 453 F.3d at 902; *Stone*, 281 F.3d at 644.  If an employee establishes a *prima facie* case of retaliation under

this method, "the burden shifts back to the employer to produce a non-discriminatory reason for its action; if the employer meets this burden the burden shifts back to the employee to demonstrate that the proffered reason is pretextual." *Amrehein v. Health Care Srv. Corp.*, - - F.3d - -, No. 07 C 1460, 2008 WL 4613877, *4 (7th Cir. Oct. 20, 2008).

Defendants admit that Clemmer participated in statutorily protected activity: complaining to her supervisor, filing a The JIB complaint, and filing a charge of sexual harassment with the EEOC. (*See* Mem. at 6.)[14]  Additionally, Defendants admit that Plaintiff performed her job satisfactorily. (*Id.*)  As discussed in the prior section, there may be a question of fact regarding whether some of the action taken against Clemmer was adverse employment action as required under Title VII.  Although we doubt the Defendants' conduct rose to the level of adverse employment action, we recognize that this is a fact-based question and that a jury could conclude that some of those actions were materially adverse. *Burlington Northern*, 548 U.S. at 68, 126 S. Ct. at 2415.  Therefore, assuming Clemmer has satisfied the first three elements of the *prima facie* case of retaliation under the indirect method, we turn now to the remaining element.

Indeed, Clemmer must demonstrate that "only [s]he, and not any other similarly situated employee who did not complain of discrimination [or another protected activity], was subjected to materially adverse action." *Humphries*, 474 F.3d at 404; *Sylvester*, 453 F.3d at 902; *Stone*, 281 F.3d at 644. Since *Stone* first articulated this standard, the Seventh Circuit has explained that a plaintiff may prove this element by identifying a similarly situated employee who was treated

---

[14] As discussed earlier, that protected activity did not include the issuance or receipt of Clemmer's right-to-sue letter.

more favorably than she and who did not participate in protected activity.  *Hancock v. Potter*, 531 F.3d 474, 480 (7th Cir. 2008); *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005) (citing *Stone*, 281 F.3d at 644).  Clemmer has failed to satisfy this element for two reasons: (1) although Clemmer vaguely identifies similarly situated employees, she has not demonstrated that they were treated more favorably; and (2) she affirmatively argues and proves that she was treated in the same way as other similarly situated employees who did *not* engage in protected activity.

Although Clemmer recognizes in her brief that she "is required to show that after filing her complaint, only she, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action," (Pl.'s Consol. Br. at 7), she never attempts to make that showing.  In fact, the portion of her brief that addresses this topic does not cite to any part of the record.  (*See id.* at 7-8.)  Despite the fact that Clemmer did not identify, with particularity, her supporting evidence in her brief as she is required to do, *see Hemsworth, II*, 476 F.3d at 490, we will still consider Clemmer's affidavit in determining whether she has satisfied this element.

In her affidavit, Clemmer identifies several court reporters who may be similarly situated to her and whom she claims were treated more favorably than she was.  (*See, e.g.*, Pl.'s SOF, Ex. A, Clemmer Aff. ¶¶ 16-19, 32, 46, 52.)  For example, Clemmer argues that Oona Smith and Paula Chiano were similarly situated employees who were treated more favorably than she was, in that they were given their preferred schedules more than Clemmer was.  (*See id.* ¶¶ 16, 19.)  However, Smith and Chiano were "low-producers."  (*Id.*)  Because low-producers and high-producers preferred different schedules, we do not think that the low-producer reporters were similarly situated to the high-producers, such as Clemmer.  Therefore, Clemmer's attempts to

argue that these reporters were similarly situated employees who were treated more favorably than she was must fail.

Clemmer does attempt to allege that some high-producers were similarly situated and treated more favorably than she was. Clemmer argues, for example, that Jamie Mitchell, another high-producer, was treated more favorably than she was when Lawless and Comeaux-Brookins assigned her to higher-transcript producing courtrooms in another district after Mitchell complained about the low income-generating courtrooms to which she was previously assigned. (*Id.* ¶ 17.) Although Clemmer argues that Mitchell's out-of-district assignment was favorable treatment, she argues, on the next page of her affidavit, that a similar out-of-district assignment given to her after she requested more preliminary hearing assignments was retaliatory. (*Id.*) Because Lawless gave Clemmer the same opportunity to work out of her district in higher-transcript-producing courtrooms, we cannot see how Mitchell was treated more favorably.

Clemmer's arguments regarding the other high-producers also fail. Although Clemmer points to a three-month period in 2006, four years after she filed her EEOC complaint, in which other high-producers' preliminary courtroom assignments increased while her's decreased as evidence that similarly situated employees were treated more favorably (*see id.* ¶ 32), we do not think the evidence supports that contention. As previously explained, some of the other high-producer's assignments also decreased during this time. (*See* Pl.'s SOF, Ex. A-7.) This three-month period does not provide us with enough information from which to infer that another reporter was treated more favorably. Although Clemmer argues that the three-month period is important because it coincided with the EEOC's issuance of her right-to-sue letter, as previously explained, this is not a protected activity. As a result, her focus on these three months is

misplaced.  If we look at other three-month periods, we see that Clemmer was assigned more preliminary hearing courtrooms than other high-producers.  (*Id.* (compare the assignments of Clemmer with Brennan, Chancellor, Epps, and Smith during the months of October through December 2006).)  Additionally, when comparing yearly totals, a which may provide a fuller picture, only one other court reporter had more preliminary hearing assignments during 2006. (*Id.* (compare Clemmer's 2006 total of 116 with Mitchell's total of 134).)  This minor difference, without more information, is insufficient for us to infer that another similarly situated court reporter was treated more favorably.

In addition to the fact that Clemmer has not sufficiently identified a similarly situated employee who was treated more favorably than she was, Clemmer affirmatively argued and presented evidence that other employees who did not participate in protected activity were subject to the same adverse employment action.  (*See* Pl.'s Consol. Br. at 5, 7 (explaining that she and others who made general workplace complaints were part of a "disfavored group" of employees who were all subject to the same adverse activity); Pl.'s SOF, Ex. A, Clemmer Aff.¶ 25  ("Disfavored reporters like myself [were subject to adverse action] as a form of punishment for our protected activity or other complaints.").)  Although Clemmer alleges that the other employees in the disfavored group made workplace complaints (*see* Pl.'s Consol. Br. at 5, 7), those complaints did not constitute protected activity.  *See Hinds v. Sprint/United Mgm't Co.*, 523 F.3d 1187, 1203 (7th Cir. 2008) ("General complaints about company management . . . will not suffice.")  The fact that some employees who did not engage in protected activity were subject to the same adverse activity as Clemmer, negates her claim of retaliation.  *Treadwell v. Office of the Ill. Sec'y of State*, 455 F.3d 778, 782 (7th Cir. 2006) (holding that where there is

evidence that an employee who had not engaged in protected activity was subject to the same adverse employment action as the plaintiff, the plaintiff cannot demonstrate that "only he, and not a similarly situated employee who did not complain of discrimination, was subjected to the adverse employment action of which he complains").  Clemmer mistakenly argues that the fact that these employees who made workplace complaints were subject to adverse action strengthens her claim.  (*See* Pl.'s Consol. Br. at 7.)  This argument might be true if the other employees' complaints qualified as protected activity; however, they do not.  Because Clemmer and other employees who did not engage in protected activity were treated equally, she cannot establish that "only [s]he, and not a similarly situated employee who did not [engage in protected activity], was subjected to the adverse employment action of which [s]he complaints." *Treadwell*, 455 F.3d at 782; *Stone*, 281 F.3d at 642.  Therefore, Clemmer failed to establish a *prima facie* case of retaliation under the indirect method.

## II.  Clemmer's Motion for Summary Judgment

Clemmer moved for partial summary judgment based on what she deems to be "the undisputed facts establishing that" neither her employer, nor any other judicial officers, "acted to investigate her complaint of sexual harassment."[15]  (Pl.'s Consol. Br. at 9.)  Defendants first

---

[15] Clemmer also argues that Defendant is liable for its failure to investigate her sexual harassment claims because it neglected its duty to "take 'reasonable steps to discover and rectify acts of sexual harassment by its employees.'" (Pl.'s Reply at 4 (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998).)  However, Clemmer misconstrues Title VII hostile environment sexual harassment cases in her attempt to apply them to a retaliation theory.  All of the cases that Clemmer cites as establishing the alleged duty discuss an employer's liability for a co-employee's harassment and the employer's defenses to such liability.  *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08, 118 S. Ct. 2275, 2292-93 (1998) (explaining the basis for an employer's vicarious liability for an actionable hostile environment created by a supervisor and possible defenses to that liability based on its action taken in response to an employee's complaints); *Parkins*, 163 F.3d at 1035 (explaining

argue that Clemmer cannot raise this claim here because she did not allege it in her charge of harassment filed with the EEOC. (Mem. at 11.) "Generally, a Title VII plaintiff may bring only those claims that were included in her EEOC charge, or that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 481 (7th Cir. 1996) (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins.*, 583 F.2d 164, 167 (7th Cir. 1976) (en banc)). Retaliation charges are generally reasonably related to initial EEOC complaints such that a plaintiff's failure to allege retaliation in an EEOC complaint does not bar them from alleging retaliation in a lawsuit under Title VII. *See id.* at 482. However, the Seventh Circuit recognizes one exception to that rule: where the alleged act of retaliation occurred prior to plaintiff's EEOC complaint, the plaintiff is barred from alleging those acts of retaliation unless she included them in her EEOC complaint. *Id.* at 482-83. At issue here is whether the act of retaliation on which Clemmer seeks summary judgment, the Defendant's failure to investigate, occurred before Clemmer filed her EEOC complaint.

---

that an employer is vicariously liable for hostile environment sexual harassment only when it has "been negligent either in discovering or remedying the harassment" and that an employer can discharge its liability "if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees") (internal citations omitted); *Saxton v. AT&T Co.*, 10 F.3d 526, 535 (7th Cir. 1993) (same); *Hunter v. Allis Charmers Corp.*, 797 F.2d 1417, 1422 (7th Cir. 1986) (explaining when an employer may be directly liable for sexual harassment when one of its employees is being harassed); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271 (7th Cir. 1991) (same).

Those cases apply only to hostile environment sexual harassment claims, whereas Clemmer's remaining claim is a retaliation claim. Clemmer apparently recognized this distinction when she admitted that she "preferred to file an amended complaint and add a count of sex discrimination (by sexual harassment)." (Pl.'s Reply at 2.) We have already granted summary judgment to Defendants on Clemmer's harassment and hostile work environment allegations. Therefore, Clemmer cannot amend her complaint. Moreover, her attempt to apply this line of reasoning to a retaliation claim fails. The Defendants' failure to investigate can only be a basis for retaliation only if the underlying elements of a retaliation claim are met.

Clemmer first complained to Mangan about Judge Iosco's behavior in January, 2002. (CSOF ¶ 34.) Clemmer requested Mangan not to assign her to Judge Iosco's courtroom in the future. (*Id.* ¶ 35.) With one exception, an apparent mistake by James Lawless, Clemmer's subsequent supervisors complied with this request. (*Id.* ¶¶ 38-39.) In June 2002, Clemmer filed a formal complaint about Judge Iosco with The JIB. (*Id.* ¶ 45.) While that investigation was ongoing, in August 2002, Clemmer filed a complaint with the EEOC. (Pl.'s SOF, Ex. A-2.) The JIB completed its investigation and informed Clemmer of its results in November 2002. (CSOF ¶ 48.) Because this act of retaliation was arguably not fully complete until The JIB completed its investigation, three months after Clemmer filed her EEOC complaint, we hold that Clemmer was not required to include this act of retaliation in her EEOC complaint.

Clemmer's allegations of retaliation regarding Defendant's failure to investigate seem to be based upon a retaliatory hostile environment theory, although the cases she cites are hostile environment sexual harassment cases. (*See* Pl.'s Consol. Br. at 9 (arguing that an employee can be liable for retaliation if they allow the "workplace environment to become 'discriminatorily hostile or abusive'" (citing *Velez v. City of Chi.*, 442 F.3d 1043, 1047 (7th Cir. 2006).) In fact, the elements that Clemmer cites for her alleged retaliation via failure to investigate claim are the elements for a sexual harassment claim. (*Id.* (citing *Durkin v. City of Chi.*, 341 F.3d 606, 611 (7th Cir. 2003) (reciting the elements for a Title VII sexual harassment claim).) However, the elements of a hostile-environment retaliation action are the same as any other retaliation claim: the plaintiff can pursue her claim via the direct or indirect methods, as discussed above. Therefore, a hostile environment can be the basis of a retaliation claim, so long as it qualifies as an adverse action. *See Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996) ("There is

nothing in the law of retaliation that restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing a complaint. It need only be an adverse employment action, as we have often held.")

In support of her argument that Defendant's failure to investigate her sexual harassment allegations constituted retaliation, Clemmer cites *Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006). (Pl.'s Consol. Br. at 10.) The plaintiff in *Rochon* was an African-American FBI agent who sued the Department of Justice for racial discrimination and retaliation. 438 F.3d at 1213. The court in *Rochon* held that the FBI's failure to investigate a death threat made against the plaintiff could constitute adverse action because "a reasonable FBI agent well might be dissuaded from engaging in activity protected by Title VII if he knew that doing so would leave him unprotected by the FBI in the face of threats against him or his family." *Id.* at 1219-20. Although Clemmer acknowledges that a failure to investigate a death threat is more egregious than a failure to investigate a sexual harassment charge, she argues that "inaction in the face of a sexual harassment complain is inaction, regardless of its' [sic] potential for actual, life-or-death consequences." (Pl.'s Reply at 3.) However, Clemmer fails to recognize that the egregiousness of the offense in *Rochon* is what led the D.C. Circuit to hold that the action could be an adverse action. *Rochon*, 438 F.3d at 1219-20.

Although we agree with Defendants that there are many good reasons to refuse to recognize a claim of retaliation by failure to investigate the underlying charge of discrimination, we do not need to do so explicitly because Defendants' alleged failure to investigate Clemmer's sexual harassment complaint was not an adverse action. An action is materially adverse if "'it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination.'" *Burlington Northern*, 548 U.S. at 68, 126 S. Ct. at 2415 (quoting *Rochon*, 48 F.3d at 1219).  Here, Clemmer's employer did not assign her to work under Judge Iosco after she made her initial complaint, with one exception, which the parties agree was an inadvertent mistake.  (CSOF ¶¶ 38-39.)  The JIB also conducted an investigation into her allegations. (CSOF ¶¶ 45-49.)  Although Clemmer alleges that Lawless intervened in the JIB investigation by prohibiting Mangan from giving a statement to The JIB (Pl.'s SOF ¶15), Mangan's affidavit denies that allegation (Mangan Aff. of 2/6/07 ¶¶ 20-21.)[16]  Clemmer may have preferred her employer to do more in its investigation, but its failure to conduct an inquiry to her satisfaction does not constitute an adverse action.  The evidence shows that Clemmer was not forced to continue to work in Judge Iosco's courtroom, nor was she denied any investigation whatsoever. Because the allegedly insufficient investigation does not rise to the level of a materially adverse action, Clemmer's  motion for summary judgment fails.

---

[16] Clemmer argues that Mangan told her that Lawless threw out the JIB investigators, but later recanted that statement in her affidavit.  (Pl.'s SOF ¶ 15.)  However, Mangan's alleged statement to Clemmer is a hearsay statement submitted for the truth of the matter asserted. Because Clemmer has not provided any arguments as to why this should be admitted, we cannot consider it at this stage.  Fed. R. Evid. 802.

**CONCLUSION**

As described in detail above, we grant Defendant's motion for summary judgment (Dkt. No. 106), deny Clemmer's Cross-Motion for Partial Summary Judgment (Docket No. 120), and dismiss this case. We also deny as moot Defendants' motion to strike Plaintiff's Responses to Defendant's Rule 56.1 Statement of Facts (Dkt. No. 129). It is so ordered.

Honorable Marvin E. Aspen
United States District Judge

Date: December 2, 2008